[Crim. No. 16010. Second Dist., Div. Two. Nov. 19, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
ARNOLD HELFEND, Defendant and Appellant.

## COUNSEL

Albert D. Silverman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kallay, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**ROTH, P. J.** — At approximately 4 p.m. on October 23d, appellant, driving a white Oldsmobile slowly, crossed the border at Tijuana into Mexico. The curiosity of Mr. Orendain, a Mexican border inspector, was aroused when he saw a spare tire on the rear seat. He stopped the car and inquired what was in the trunk and asked for the key. Appellant replied he had rented the car and had no key. He was directed to park at a place off the highway. The trunk was opened by Mexican custom officials with a tire iron and a jack post. The key was thereafter found in one of the pockets of a coat which was on the rear seat of the car.

Before the trunk was opened, he offered $5,000 to the commandant of the border guard, saying, "I don't want any troubles or any problems." He increased the offer to $10,000 after the trunk was opened.

When open, the trunk revealed the body of Max Levin, clad in shorts and a T-shirt and wrapped in blankets which were fastened with wire, two shovels, a pick and two cans of lye. A .38 pistol was found in the glove compartment. Appellant denied knowledge of the presence of the body in the trunk.

Appellant was interrogated through an interpreter from approximately 8 p.m. to 11 p.m. on the day of his arrest, by various Mexican officials, among whom were Sergeant Amaya of the Mexican police, Mr. Arceo, chief of police, and Mr. Ochoa, the Mexican district attorney. Appellant was told that the law allowed him to answer or refuse to answer questions. He was not told he could have a lawyer. He requested a lawyer and was told he would first have to see the district attorney. He was advised, however, that he need not make any statement and that he could meet with the United

States Consul on the morning following his arrest. The trial court found that there was no suggestion in the record that the statements made were in any respect involuntary.[1]

Appellant stated to the Mexican authorities that Max Levin drew a pistol, he struggled for the weapon and finally shot Max. He placed the body in the automobile without anyone's help, bought two shovels, a pick ax and two cans of lye and drove around for two hours in Los Angeles not knowing what to do. He then drove to Tijuana looking for a deserted place where he could bury the body. He identified the pistol found in the car as the one that killed Max.

Appellant explained this statement made to Mexican authorities in the presence of and after consultation with and upon the advice of his local counsel by saying that he had told the state district attorney, Valvida Ochoa, that he had killed the victim in self-defense. He explained that he had made this statement which was false because he feared he would be retained and tried in Mexico and that he had been informed by the Mexican authorities that if the killing had occurred in self-defense, he would go free.

Mr. Herbert Arceo, a chief of group with the Ensenada police, testifying in rebuttal, denied that appellant had been told prior to his being interviewed by Mr. Ochoa, the state district attorney, that if the killing had occurred in self-defense, he would go free. However, he conceded that, ". . . I told him that in case he shot Mr. Levin in self-defense, he can be released posting a bail."

Mr. Arceo testified further that appellant initially denied any knowledge of Levin's body in the trunk of his car. However, when he was advised that American authorities were certain to investigate the incident and discover whatever connection might exist between appellant and the deceased, appellant decided to cooperate. He identified the victim and informed Mr. Arceo that Levin had been shot by a crazy friend of appellant's. He declined to disclose the friend's name.

An autopsy was performed in Mexico and in the opinion of the Mexican physician who performed it, death was caused by multiple (nine) gunshot

---

[1]"THE COURT: The defendant was variously advised that he had a right to an attorney, but none of that advice—— I believe both Mr. Garcia, and if my memory is correct certainly Chief Perez Arceo, advised him that while he could have an attorney that the system was that he had to make a statement to the District Attorney first before he could see his attorney or see an attorney.

"He was also advised by Mr. Garcia that under the routine followed in Tijuana that the United States Consul made a tour of the Mexican jail every morning, and inquired for any American citizens, and would arrange to get him an attorney.

"So he knew he could expect an attorney in the morning."

wounds. This opinion was confirmed on October 27 by pathologist Dr. Graham, in Los Angeles.

The background disclosed by the record shows that appellant had been married to Adele Levin, the victim's widow from January 1, 1955, continuously to December 1961, when Adele left him, initiated proceedings for and obtained an interlocutory decree of divorce in July 1962. A child, Robert, was born of that marriage on April 4, 1960.

Adele had met the victim, Max, prior to her interlocutory decree from appellant and married Max on October 25, 1963. Adele and Max remained married until October 23, 1967, the day of his death. There were two children of that marriage.

Appellant, at the time of Max's death, was in the car repair business and had, for some time prior to October 23, had in his employ, Filbert Aguirre (Phil) with whom, he says, he discussed from time to time visitation problems he had with his former wife Adele concerning his son.

Phil knew Max as he had seen him on a number of occasions with appellant at appellant's place of business and knew where the Levins lived.

On the morning of October 23, appellant, driving his Oldsmobile, picked Phil up at Phil's home and told him of an unsatisfactory conversation he had had with the victim on the previous evening with respect to his rights of visitation, whereupon Phil suggested that they "put a scare into Max."

Appellant and Phil[2] proceeded in the Oldsmobile in the early morning of October 23 to a place where they could watch Levin leave his residence. When the victim drove off in his Impala at approximately 8 a.m. and had proceeded a few blocks, Phil drove the Oldsmobile so as to obstruct the progress of the Impala and forced it to stop at the curb. Phil approached the passenger side of the Impala, stated to Levin he was out of gas, climbed into the passenger side and pointed a snub-nose .38 revolver at the victim. He then forced the victim to drive to a side street and forced him into the trunk of the Impala. When this was accomplished, Phil drove the Impala to appellant's place of business and honked the horn.

Appellant, who had been concealed in the Oldsmobile, followed the Impala at a distance after Phil had forced his entry into the car and proceeded to his shop by a different route. When Phil arrived at the shop and honked the horn of the Impala, appellant was already there and opened the garage door which was immediately closed. Phil testified that he then

---

[2]Aguirre had pleaded guilty to second degree murder and was a state witness.

went to the bathroom and when he returned to the closed garage, he saw a hose attached to the rear tailpipe of the car, the car was running, pumping exhaust fumes into the car, the victim according to Aguirre was yelling, ". . . You are suffocating me, Arnie. You are killing me." Aguirre ran over, pulled the hose out. The victim was trying to pry open the trunk; appellant shouted, "no, no," fired twice into the trunk and yelled as if speaking to the victim, "on purpose you did it, on purpose, . . ." Appellant then reached down, opened the trunk and fired into it with a second S. & W. .38 which appellant had taken from his desk until the gun was empty.[3] Aguirre said appellant was holding the trunk lid down with his left hand firing with his right and that he did not count how many times appellant fired into the trunk with the second weapon. Appellant turned with the gun in his hand and said to Aguirre that he had to have help, that they had to get rid of the body and that Aguirre was involved.

Aguirre said to appellant, "What have you done?" Appellant's answer was jumbled and incoherent. He was sobbing, tears were running out of his eyes and down his cheeks, and he was not "completely natural."

Phil said he subsequently proceeded to clean up the garage and gathered the victim's personal effects, and threw them away. However, a gold money clip which had belonged to the victim was subsequently found to be in possession of Phil's father.

Appellant's version of the shooting was different. He testified he was the one who went to the bathroom when the Impala was sealed in the closed garage of his shop and when he came out of the bathroom and saw Phil at the rear of the trunk with the trunk lid open, holding a snub-nosed .38 and ejecting shells. Both then walked into the office section of the garage and Phil took a S. & W. .38 out of a desk drawer. Appellant asked what his intentions were. Phil replied that he was going to make sure Max was dead. Appellant didn't interfere because he feared Phil would kill him. He then heard a volley of shots. Phil returned and said, "You are in as deep as I am, so the only thing . . . left to be done is we will have to get rid of the body." Appellant agreed. Appellant was ordered by Phil to look at the body and was threatened with the same treatment if he should "cop out." Appellant was very frightened and became nauseous.

Although each blamed the other for the actual shooting, the record is clear that both men covered the body with blankets which they wired at the ends, a spare tire was removed from the trunk of the Oldsmobile and the body transferred from the Impala to the trunk of the Oldsmobile. They left the garage in the Oldsmobile and purchased shovels and cans of lye. They

---

[3]This second gun was subsequently recovered from the ceiling of the garage operated by appellant.

headed towards the San Diego Freeway. According to appellant Phil suggested during the drive that since they were in it together, that appellant should share his assets with him. As they approached the border, Phil suggested that since he had thus far done all the dirty work, that appellant drive through alone and he would meet him on the other side. Appellant never saw Phil again until the preliminary hearing.

Robert Drobman testified that he had known appellant since 1951. He testified to conversations with appellant, the admission of which is assigned as error.

Sometime previous to 1963, appellant had asked Drobman if he "would beat up Max Levin." Levin was hospitalized in 1963, and appellant "had stated he had Mr. Levin beat up." Following a fire in the Levin residence in December 1964, appellant "stated that he had had it done." Further, sometime in 1965, appellant stated to him that, "I should not let my wife be around Adele Levin . . . because if anything happened to Adele, something might happen to my wife." In the latter part of 1966, appellant telephoned Drobman. He told Drobman that Max Levin and Adele were attempting to adopt his son and requested Drobman to purchase a gun, that appellant "had requested the revolver because he wanted to have something done—because of the adoption."

Drobman made no effort to purchase a gun but he informed appellant that he had been unable to do so. Drobman added that in February of 1967, appellant "offered me $5,000 to kill Max Levin" and stated that it should be done "soon."

Appellant contends: (1) It was error to admit the testimony of Mr. Drobman; (2) The court failed to give the jury a manslaughter instruction; (3) Deprivation of the right to a fair and impartial jury; (4) The prosecutor was guilty of prejudicial misconduct; (5) Denial of right of confrontation and cross examination; and (6) Admissions and statements made by appellant in Mexico should have been excluded. We conclude that no prejudicial errors occurred.

■ Drobman's testimony was admissible. ■ When "the motive of the crime is sought to be established before a jury, the whole conduct, life, and character of the parties as affecting this question, is open to inquiry." (*People* v. *Le Doux*, 155 Cal. 535, 552 [102 P. 517].) ■ Appellant objected to the statements concerning the 1963 beating and the 1964 fire only on the ground of remoteness. He objected to the threat to Drobman's wife on the additional ground of relevancy. No objection was made to the testimony re adoption, purchase of a gun or the offered payment of $5,000. The record shows appellant's counsel advised the court: "The last incident relating to . . . purportedly asking Mr. Drobman

to secure a gun, and the incident purportedly where Mr. Helfend supposedly asked him to get—do away with Mr. Levin for $5,000.00. Not only do we not object to that, but we would heartily concur in it. We are not objecting to those because they are coincident with the time. . . . THE COURT: So you are not objecting to that incident? [APPELLANT'S COUNSEL]: No, we are not objecting to that alleged incident whatsoever, because it is not only proximate in time but obviously pertinent to the specific issues which we are here for today. THE COURT: So your objections really either boil down to relevancy or remoteness? [APPELLANT'S COUNSEL]: That is correct."

We find no abuse of discretion in this ruling. Appellant cites *People* v. *Hamilton,* 55 Cal.2d 881 [13 Cal.Rptr. 649, 362 P.2d 473], to fortify his position and contends, although he did not raise the point in the trial court, that the Drobman testimony was improperly received under the hearsay rule. Apart from the fact that such an objection cannot be considered for the first time on appeal, it is wholly without merit. Technically, it is doubtful that the Drobman testimony falls within the hearsay rule. None of it was "offered to prove the truth of the matter stated" (Evid. Code, § 1200), and the jury was so instructed with respect to the statements quoted, prior to their receipt and again before the cause was submitted to them. In *Hamilton,* page 889, et seq., the court was concerned with the hearsay statements of the *deceased victim* rather than that of *the accused.* (Cf. *People* v. *Ireland,* 70 Cal.2d 522, 528, 529 [75 Cal.Rptr. 188, 450 P.2d 580].) *Hamilton* is not applicable.

In any event, the evidence of appellant's statements was admissible under Evidence Code section 1220, which provides that such evidence "is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party. . . ."

■ The trial court did not err in failing to instruct *sua sponte* on voluntary manslaughter. The only evidence which could conceivably justify such an instruction was Aguirre's testimony.

Except for this testimony of Aguirre describing appellant's physical state, appellant's defense testimony and defense strategy was wholly incompatible with Aguirre's testimony. In addition, the record shows that he did not request such an instruction and took the position that it would not be proper to give one.

The trial court noted that manslaughter instructions had been given at appellant's first trial and observed that the "evidence must have been different because I cannot find the facts of manslaughter in this case." The

trial judge repeatedly asked defense counsel to suggest any included offenses warranted by the evidence. One of the discussions included the following dialogue:

"THE COURT: You are agreeing with me, Mr. Indovina [one of appellant's trial counsel], that manslaughter is not possibly a lesser included offense on the elements of this case? MR. INDOVINA: I don't think it is, no. THE COURT: On the evidence in this case? MR. INDOVINA: I don't think it is. THE COURT: I don't think it is. MR. STOVITZ [Deputy District Attorney]: I don't think it is. Well, somebody may disagree with us upstairs. MR. INGBER [appellant's second trial counsel]: That is their shot. That is their right. They take the pot shots as they see it."

This conversation occurred prior to the testimony of Aguirre. However, counsels' failure thereafter to alter their expressed views and desires is significant. (*People* v. *Graham,* 71 Cal.2d 303, 318 et seq. [78 Cal. Rptr. 217, 455 P.2d 153]; *People* v. *Phillips,* 64 Cal.2d 674, 681 [51 Cal.Rptr. 225, 414 P.2d 353].)

"In the absence of a clear, tactical purpose, the courts and commentators eschew a finding of the 'invited error' that excuses a trial judge from rendering full and correct instructions on material questions of law. Witkin has stated that, when the trial court has the duty to instruct, *sua sponte,* on the rules of law necessarily involved in a case, erroneous instructions are reviewable 'though invited by the defendant's own neglect or mistake.' . . . ▪ Accordingly, if defense counsel suggests or accedes to the erroneous instruction because of neglect or mistake we do not find 'invited error'; only if counsel expresses a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction, do we deem it to nullify the trial court's obligation to instruct in the cause." (*People* v. *Graham, supra,* p. 319.)

▪ Standing alone and completely contradicted by appellant's testimony and his theory of defense, Aguirre's incidental testimony that appellant was subjected to a reaction of tears and incoherence following a commission of a heinous crime, if accepted as a fact, does not suggest defenses such as diminished capacity, intoxication, provocation, heat of passion or accidental firing, as a basis for a manslaughter instruction.

In *Graham,* the defense desired the instruction. The court says, at page 320: ". . . counsel . . . would have desired such an instruction but, because of ignorance or inadvertence, did not insist upon its rendition." At

bench the record leaves no doubt that both defense counsel, to fortify their theory of defense, had a "clear tactical purpose" to establish that appellant at no time, did any of the shooting and did, with calculation, avoid the instruction.

If the manslaughter instruction had been given, contrary to the declared attitude of counsel, the giving thereof on the record before us would unquestionably be urged as error on this appeal. In fact, if appellant had been convicted of manslaughter instead of second degree murder, we surmise that appellant would urge that the giving of the instruction was an erroneous suggestion to the jury by the trial court that appellant must be convicted of some homocide, and we would be faced with the argument that if it had not been given, appellant would not have been convicted of any crime involving homicide. *Graham* does not announce a doctrine which would permit a defendant to eat his cake and have it.

■ Appellant's third contention is predicated on *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. He asserts that a juror was improperly excused in violation of *Witherspoon* doctrine. The declaration of one of appellant's trial counsel filed in support of his motion for new trial says in part: "The Court fairly adhered to the guidelines set forth in the *Witherspoon* case in its Voir Dire of the jury concerning their feelings on the death penalty. . . ." At the time the motion was argued, appellant's trial counsel stated: "I am sure that the Court noted that I concurred with the Court on the voir dire in following *Witherspoon.* We are certainly not questioning that aspect." In any event, even if a *Witherspoon* violation had occurred, it would not warrant a reversal of the jury's determination that he was guilty of second degree murder. (Cf. *Witherspoon* v. *Illinois, supra,* p. 518 [20 L.Ed.2d at p. 782]; *In re Anderson,* 69 Cal.2d 613, 620 [73 Cal.Rptr. 21, 44 P.2d 117].)

■ The prosecution was not guilty of prejudicial misconduct. Our attention is directed to two alleged improprieties culled from 10 volumes of transcript. During appellant's cross-examination he was asked:

"Q. You say your statement that you gave on October 31st was correct and true? Is that right? A. Yes. Q. I show you Page 30 of the statement. This is after you and Mr. Aguirre killed Max Levin. They asked you a question. MR. INGBER: Your Honor, we are going to move—MR. INDOVINA: Just a minute, your Honor. We ask that that statement be stricken. There is no evidence in this case that Mr. Helfend killed Max Levin. That is the very issue we are trying. THE COURT: That is right. That is the very issue we are trying. The District Attorney is admonished for his statement. The jury is admonished to disregard the statement."

The reference to Levin's death was merely chronological and prepara-

tory for a question later propounded. The prosecution's colloquial short-cut to pinpoint the time to which a particular question related was not pragmatically false since, even appellant conceded that the homicide had occurred in his presence after he had agreed to "scare" the victim. Preferably, the prosecutor should have inquired, as he did after the objection, "After Mr. Max Levin was killed. . . ." The incident constituted neither misconduct nor prejudicial error. There was no showing of any bad faith or moral dishonesty by the prosecutor. (*People* v. *Beivelman,* 70 Cal.2d 60 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Bagley,* 208 Cal.App.2d 482, 488 [25 Cal.Rptr. 340].)

The second incident occurred when, on cross-examination, appellant's attention was called to a prior statement that he had picked up Aguirre on the day of the murder because they had previously discussed "something about Mr. Levin." Appellant had testified at the trial that he picked up Aguirre to attend to some salvage business. The deputy district attorney's question, "Which is true? You picked him up for the salvage business or you wanted to get rid of Max Levin on this day?" was reasonable and proper. We perceive no error, although the objection to it, "in the form in which it is phrased," was sustained.

■ Appellant, in pro. per., supplements his counsels' briefs. He urges that he was deprived of the right of confrontation and cross-examination in respect of the testimony of Amaya, Barios, Garrido and Orendain.

The testimony of the persons in question was the direct and cross-examination of each at the first trial. Before the testimony of Amaya was read, the following took place: "MR. STOVITZ [Deputy District Attorney]: . . . I propose to read the testimony of Jose Hernandez Amaya. The stipulation is as follows: That Jose Hernandez Amaya may be deemed to be called, sworn and testified in conformity with his testimony previously given and the defendant specifically gives up his right to confront and cross-examine the witness; . . ." All counsel and the court accepted the stipulation and the following then took place: "THE COURT: Mr. Helfend, you heard that statement and you understand and agree to it? DEFENDANT HELFEND: Yes, your Honor. THE COURT: And you agree to it? DEFENDANT HELFEND: Yes. THE COURT: All right."

A similar stipulation was had in respect of Barios, Garrido and Orendain.

In respect of Morreau, police officer of the San Diego Police Department, a stipulation of previous trial testimony, direct and cross-examination was that photographs taken by Morreau and introduced as Exhibit 7 were taken by him and could be introduced.

In respect of Von Borstel, the stipulation, also with respect to testimony both direct and cross-examination at a previous trial, was that, ". . . he was called, sworn and testified as he did on pages 146 through and including 178 . . . and so forth." The deputy district attorney turned to defendant and the following took place: "Mr. Helfend, did you understand the stipulation?" The defendant answered "yes." He was asked if it was agreeable with him. He answered "yes." The court accepted the stipulation.

In respect of Armijo, the stipulation was that testimony, direct and cross-examination, given at a previous trial could be read. It showed substantially that he was a police officer of the San Diego Police Department, and that on October 24, 1967, he went to Tijuana and took possession of a paper bag containing seven cans of lye, a .38 caliber revolver, an overshirt, an undershirt, and certain other items which were introduced in evidence.

In respect of the testimony of Kirkbridge and Shadbolt, the testimony of each as given for the defendant at the previous trial was introduced by appellant's counsel on his own behalf.

Appellant, in pro. per., urges further that his constitutional rights were violated when his counsel, after Aguirre had left the stand, desired to introduce a tape recording of Aguirre's conversation with a police sergeant. The court inquired of defense counsel if it was offered for impeachment purposes or all purposes, and defense counsel replied: "Under 1235 I think it would be perfectly proper for that purpose." He stated further: "Well, I intended to introduce the statement myself in evidence and I am certainly not going to be hesitant about the tape recording."

The court then directly addressed defendant and explained to defendant: "There is some question, as I say, whether those circumstances would give you any constitutional standing to object to the introduction of the statement. Of course, your counsel had moved it into evidence——." ·

The court specifically then said to appellant: "I am trying to ask you whether it is agreeable . . . assuming, you have a constitutional right not to have it come into evidence for all purposes . . . I want a personal waiver of your constitutional right of confrontation. . . ." The appellant indicated he did not understand what precisely was involved.

The matter was finally settled by the following: "I have now been advised by counsel for the defendant . . . he intends to offer it only for impeachment purposes. Is that correct? MR. INGBER: That is correct."

We find no error. On the contrary, the record shows a meticulous preservation of appellant's rights.

█ It is appellant's final contention that it was error to receive

evidence concerning his statements to the Mexican authorities made within hours of his arrest because he had not been advised of his right to counsel. No such right did exist under Mexican law.

Appellant could not and does not object to the testimony of the Mexican border officials concerning his false statements regarding the contents of the trunk of his car since these were made prior to the time the trunk was opened or appellant had been placed in custody. Similarly, he could not, and does not, object to the evidence of his proferred bribes to the commandant of the border guard since such offers were wholly spontaneous and unsolicited by official personnel.

Appellant in his pro. per. brief citing, among others, *Escobedo, Dorado* and *Miranda,* insists there was psychological coercion because the record shows that both Mr. Ochoa and Chief Arceo "advised him that while he could have an attorney . . . he had to make a statement to the District Attorney before he could see his attorney. . . ." He also asserts that his only concededly false statement, i.e., that he had killed Levin in self-defense, was made because he had been led to believe this would cause him to be returned to the United States. However, the statement itself was given in the presence of both Mexican and American newspaper reporters and no question of physical or mental torment is in issue herein.[4]

Respondent urges that, except as to involuntary confessions which violate fundamental due process, our constitutional provisions as interpreted by *Miranda* and *Dorado* are not and cannot be directed at Mexican officials. (*Brulay* v. *United States,* 383 F.2d 345, 348; *People* v. *Price,* 63 Cal.2d 370, 378 [46 Cal.Rptr. 775, 406 P.2d 55]; *People* v. *Wright* (1969) 249 Cal.App.2d 692, 694 [57 Cal.Rptr. 781], hearing denied.)

In *Brulay* v. *United States,* Fourth Amendment rights in respect of search and seizure were violated by Mexican officials, nevertheless, the evidence was admitted.

The court said at page 348: "The Fourth Amendment does not, by its language, require the exclusion of evidence and the exclusionary rule

---

[4]It should be noted that neither appellant's statement to Mr. Ochoa or to Mr. Arceo constitued a confession. His statement to Chief Arceo was essentially equivalent to his statement subsequently made to local authorities upon the advice of his counsel and repeated in his testimony at trial. The earlier statement merely failed to identify the "crazy friend" who killed Levin as Aguirre. Appellant's statement to Mr. Ochoa, the Mexican federal district attorney, to the effect that he had killed in self-defense, though concededly false, was not a confession nor an admission more damning than his uncontestable presence at the wheel of a car containing the body of his former wife's husband. The relatively minimal impact of these earlier statements, when considered with the overwhelming evidence independent thereof, did not result in prejudice to appellant.

announced in *Weeks* is a court-created prophylaxis designed to deter federal officers from violating the Fourth Amendment. Neither the Fourth nor the Fourteenth Amendments are directed at Mexican officials and no prophylactic purpose is served by applying an exclusionary rule here since what we do will not alter the search policies of the sovereign Nation of Mexico.

"For these reasons we hold that there was no error in admission of evidence of the seized amphetamine tablets."

In *Brulay,* too, the defendant was interrogated by Mexican officials. The court noted that, ". . . he did not request an attorney and bring himself within the shelter of *Escobedo.* . . ." (P. 348.)

Defendant in *Brulay* was questioned intermittently at the Mexican police station from approximately 9 a.m. to 11 p.m., a much longer period than that involved in the case at bench. Indicating that defendant's rights under *McNabb* v. *United States,* 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608], were undoubtedly violated, the court goes on to say at page 349 [87 L.Ed. at p. 828]: "There is no evidence of any physical or psychological coercion, except what might be inferred from the total elapsed time between the commencement and termination of the interrogation. Customs Agent Moore, who saw defendant on January 30, testified that defendant bore no visible bruises, did not appear to be sleepy and made no complaints about his treatment by the Mexican officials. Defendant did tell the United States arresting officer that he had cooperated fully with the Mexican police. The trial court specifically found that the statements were not coerced and then, by more than adequate instructions, told the jury that unless it is found that the confessions were voluntary it should disregard them."

█ "The purpose of the *Escobedo-Dorado* rules has been defined as 'primarily to prevent police tactics which, in the past, have spawned involuntary confessions.' [Citation.]" (*People* v. *Cotter,* 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862].) "Our decision in *Dorado* cannot be construed as a general prohibition against the admission into evidence of incriminating statements made by one suspected or accused of a crime upon a prosecution therefor. The prohibition is directed against procedures which deny to a suspect or an accused due process of law: ' "So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation." ' [Citations.]" (*People* v. *Price,* 63 Cal.2d 370, 378 [46 Cal.Rptr. 775, 406 P.2d 55].)

Although statements may have been made under conditions which in the past have spawned involuntary confessions, since we cannot correct such

conditions in a foreign country by applying an exclusionary rule, it seems to us there is no basis for excluding a *particular statement* which was not made involuntarily. This is particularly imperative in view of our rule that once it has been determined that a confession was improperly obtained generally all subsequent repetitions of this confession will also fall automatically and without regard to the manner in which subsequent statements were given and received. (*People* v. *Spencer,* 66 Cal.2d 158, 167-168 [57 Cal.Rptr. 163, 424 P.2d 715].)

▇▇▇▇ Appellant, relying on *People* v. *Kelley,* 66 Cal.2d 232, 248 et seq. [57 Cal.Rptr. 163, 424 P.2d 947], argues, however, that in California. all of the *Miranda* rights of an accused are now of such "constitutional due process" dimension as to preclude the application of the silver-platter doctrine or a reasonable facsimile thereof to any statements obtained without compliance with *Miranda* rules.

In *Kelley* (decided March 2, 1967; rehearing denied April, 1967), a confession was made to military authorities in respect of a violation by defendant in military service of section 288a of the Penal Code.

The defendant did not request the custodial authorities for counsel, as did the appellant at bench. It was held, however, he did not waive his right to counsel and the court stated the question for decision as follows:

"If it be assumed that when this confession was secured by the military it was lawfully secured, should it be admissible when offered in a California court where it would be inadmissible if secured here? The solution of this problem is not entirely free from doubt." (P. 249.)

The court then said, at 250-251: "The solution to this problem turns upon the nature of the rights protected by the *Escobedo* rules. There is little doubt that if the evidence, even if validly secured, were secured by means that shock the conscience, or in violation of a fundamental constitutional right, it would not be admissible in a jurisdiction excluding it for these reasons. That is what is told us by the *Elkins* case. The real question is the nature of the rights protected by *Escobedo.* One of the important purposes of the rules announced in that case was that it was necessary to deter improper police practices (*In re Lopez,* 62 Cal.2d 368, 372-373 [citation]) that might lead to involuntary confessions. (*Johnson* v. *New Jersey,* 384 U.S. 719, 729-730 [16 L.Ed.2d 882, 86 S.Ct. 1772]. See *People* v. *Rollins, supra,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) But it cannot be denied that the whole series of cases—*Escobedo, Lopez, Dorado, Miranda, Johnson* and *Rollins,* and their numerous progeny—was fundamentally aimed at protecting the Fifth and Sixth Amendment rights of the accused, that is, to protect against self-incrimination and to protect the

right to counsel. These are, of course, fundamental constitutional rights. Thus, the *Elkins* rule is applicable.

"The most recent case to come to our attention supports this view. In *United States* v. *Miller* (D.Del.) 261 F.Supp. 442, military policemen apprehended the accused, an airman, while he was in possession of a stolen automobile and took him to the military headquarters of the air police for questioning. He was there interrogated and signed a statement inculpating himself. As in the instant case he was not notified of his right to counsel, nor, unlike the present case, was he warned of his right to remain silent. He was tried in a civilian court. It was held that the statement was not admissible."

The conclusion in *Kelley* relies in part upon *United States* v. *Miller, supra,* and it seems to us that the purpose of *Kelley* is to make crystal clear that the courts of this state will not accept "an attempt to extend the sphere of military justice and . . . make civilian authority the handmaiden of military discipline." (P. 251.) This conclusion on our part is fortified by *Wright*.

In *Wright*, defendant apprehended by a security guard of the Los Angeles County Hospital, made incriminating admissions. He had been given no *Miranda* or *Dorado* warnings. The question considered was whether the security guard was one of the "authorities" who must advise a suspect of his constitutional rights. The court held that the security guard in question was not one of the "authorities" encompassed in those cases and said, at pp. 694-695:

"It does not matter that a particular employee's duties may be confined to the protection of persons and property on his employer's premises or that his employer may be the state, a political subdivision thereof or a local entity. What does matter is whether he is employed by an agency of government; federal, state or local, whose primary mission is to enforce the law. This conclusion, it appears to us, is implicit from the purposes of the *Dorado* rule, as explained [in] *In re Lopez*, 62 Cal.2d 368 [citations]."

At bench it is obvious that the Mexican authorities had every right to hold and interrogate appellant. They were not employed by any authorities in the United States "federal, state or local whose primary mission is to enforce the law. . . ." There is no suggestion in the record that any cooperation of the Mexican officials was enlisted, even remotely, by any law enforcing authorities within the United States to obtain evidence in respect of a possible crime committed in the United States.

It should be noted that *Wright* was decided in March of 1967, and petition for hearing was denied on May 17, 1967 (Peters, J., author of

*Kelley*, dissenting), a month after denial by the Supreme Court of a rehearing in *Kelley*.

When an American citizen leaves the territorial jurisdiction of his country for the purpose of disposing of the body of a murder victim he assumes a risk, that if apprehended by the authorities of the foreign jurisdiction, the customary legal, investigative and interrogative procedures in such foreign jurisdiction may not conform to those of his native land. Whether the fruits of such a foreign investigation and interrogation may be received in the courts of this state should depend upon whether the methods adopted in the foreign jurisdiction so violate fundamental due process as to undermine the truth of the evidence acquired and used as distinguished from prophylactic measures to prevent unlawful use of police authority. At bench, we find nothing innately or inherently improper in the interrogations conducted by the Mexican authorities in the instant case.

There is no evidence of nor is there any suggestion of threat, coercion, or promise of immunity or reward, and there is no evidence that any of the interrogations were conducted under such circumstances or in such places as to suggest that any of the statements made to any of the Mexican officials were made under any physical or mental discomfort or that any of the statements made were in any respect involuntary.

The judgment is affirmed.

Herndon, J., and Fleming, J., concurred.

A petition for a rehearing was denied December 9, 1969, and appellant's petition for a hearing by the Supreme Court was denied January 14, 1970. Peters, J., was of the opinion that the petition should be granted.