[Crim. No. 4478. Fourth Dist., Div. One. Mar. 20, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCISCO MORENO NEUSTICE, Defendant and Appellant.

**COUNSEL**

Frederick L. Hetter, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Patrick J. Hennessey, Jr., Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**COUGHLIN, J.***—Defendant, by information filed March 13, 1970, in the County of Tulare, was charged with the murder of Louis Troyn in that

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

county on September 3, 1968; entered pleas of not guilty and not guilty by reason of insanity; moved to dismiss upon the ground he had been denied his constitutional right to a speedy trial, but the motion was denied; moved for a change of venue and the motion was granted, the cause being transferred to San Diego County; was tried by a jury which found him guilty of murder in the first degree; withdrew his plea of not guilty by reason of insanity, whereupon the same jury considered the issue of punishment, fixing it at life imprisonment; moved for a new trial and for a reduction in the degree of the offense, which was denied; was sentenced to imprisonment for life; and appeals, contending the court erred (1) in admitting incriminating statements, including confessions obtained from him without a *Miranda* or *Escobedo* warning; (2) in denying his motion to dismiss; (3) in striking the testimony of a witness on the ground it was hearsay; (4) in denying him the right to show the incriminating statements and confessions attributed to him were coerced and not voluntary; and (5) in denying his motion for a new trial or, in the alternative, to reduce the degree of the offense to manslaughter.

The victim, Louis Troyn, was bludgeoned to death with a piece of metal pipe at his residence in Tulare County. Defendant was living in the area immediately before the killing and left the day after the killing. His bloody fingerprint was found on the wind wing of a truck located just west of and alongside the residence. An investigation by deputy sheriffs who found the victim's body revealed his Buick automobile, dog and T.V. set were missing. The dog was found in Los Angeles. Defendant was located at San Quentin in Mexico driving the Buick.

Before the killing, i.e., on August 5, 1968, defendant was released from the county jail at San Diego where he had been placed by the United States Marshal following his arrest, under an indictment filed in the federal court on October 26, 1966, charging him with four counts of inducing illegal entry of aliens into the United States and four counts of transporting aliens into the United States.[1] Thereafter he took up residence in the area where the murder was committed. Deputy sheriffs, in the course of their investigation, were informed defendant and the victim's automobile could be located in San Quentin, Mexico. On September 17, 1968 Deputy Sheriffs Bryant and Flores went to Ensenada, Mexico; contacted Chief of Police Arceo and Chief of Detectives Mendoza; told these officers they were investigating an automobile theft and a homicide case; showed them photographs of the victim and of his residence; also showed them a photograph of defendant; indicated their belief he was the person who

---

[1] We have taken judicial notice of the records of the federal court pursuant to Evidence Code section 459.

had committed the crimes; and told the officers they had been informed defendant could be located in San Quentin. There is no direct evidence respecting any request made by the deputy sheriffs of the Mexican officials in connection with the case. However, the evidence supports an inference the deputy sheriffs asked the chief of police and the chief of detectives to assist in locating defendant. There was some discussion about the expense involved because a trip to San Quentin would necessitate the use of a truck which was in need of repair. Apparently the Mexican officials received some assurance reimbursement to cover the expense of the trip would be forthcoming. Subsequently Arceo received $100 by telegram from Bryant.

On September 22d, Chief Mendoza gave three Mexican officers, Carrillo, Granados and Cota, a picture of defendant, told them "to look for him for theft of a car and for homicide"; furnished them with a description of the car; and gave them "orders to go out and try and locate the stolen car." The officers left forthwith in a truck and, as they approached San Quentin on a narrow roadway, came upon the stolen Buick being driven toward them. The truck and the Buick stopped. Officer Carrillo left the truck; went to the Buick; identified the driver as defendant; and told him "we had had information that that was a stolen car." This was the beginning of a series of eight conversations in which defendant made incriminating statements including confessions of the murder of Troyn which defendant contends are not admissible under the exclusionary rules stated and applied in *Miranda* v. *State of Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

The court passed upon the admissibility of the statements in question following a hearing outside the presence of the jury pursuant to Evidence Code sections 402 and 405; concluded defendant's objections were not well taken; and admitted all the statements except those given in response to an interrogation to which defendant objected.

After Carrillo told defendant the officers had information he was driving a stolen car, he said it seemed strange to him it took three officers to look for a stolen car, and volunteered the statement: "I think that it isn't for the car. It is for the little old man that I threw over there in Tulare." Following this, Granados and Cota came up to the Buick, and were present when defendant alighted; was searched by Carrillo; and during the search volunteered the further statement: ". . . he knew that the reason—that the reason wasn't for the theft of the car that three officers had—were there, he said that he thought that the reason was because he had finished off or done in a little old man in Tulare."

The officers took defendant into custody; placed him in the truck; impounded the Buick; and returned to Ensenada. While in the truck, defendant again initiated a conversation respecting the reason the officers came to San Quentin and said: ". . . he knew very well that just for a stolen car three policemen wouldn't be going, that he knew that there was another reason and he thought that the other reason was on account of the old man that he had done in in Tulare." Officer Cota told defendant if he knew the reason to tell them. Thereupon defendant volunteered a statement in detail of the events preceding, during and after the killing in Tulare. This statement constituted a full confession of the killing, stealing the Buick automobile, the T.V., the shotgun and the dog.

Defendant told the officers he was a Mexican citizen, having been born in Mexico, as well as an American citizen. There was testimony under the law of Mexico a Mexican citizen may be tried in Mexico for the offense of murder or theft committed in the United States. Defendant was held in custody under this law pending an investigation to corroborate his statement he was born in Mexico.

After the three officers and defendant arrived in Ensenada all of them went to an office where they had coffee and, as testified by Officer Granados, defendant "talked to us during the time we were drinking coffee, that is, Mr. Moreno [Moreno Neustice] was talking, talking about the history of the homicide of the old man. . . . He repeated to us what he had already told us in the pickup, that he had killed that man over there in Tulare, to rob him of some money, and he talked in more detail that he had killed him with a pipe of a type, and that he had thrown the pipe away with which he had hit him in the head. And he repeated to us all of the history referring to the little old man." The foregoing statement was volunteered. During the latter part of this confession Chief Mendoza came into the room and ordered an "official declaration" be taken. Thereupon Chief Arceo was advised of the statements made by defendant; asked defendant if his statements were put in writing would he sign such; and upon receiving an affirmative reply, instituted the taking of the "official declaration." The services of a typist were obtained; defendant was told "to tell everything about the way he killed the man." His statement of the incidents preceding, attendant upon and following the killing again was related in detail. The typist copied them in writing; the writing was signed by defendant and by the three officers, Carrillo, Granados and Cota.

All of the foregoing statements were made on September 22. On September 23, Deputy Sheriff Bryant caused $100 to be wired to Chief Arceo for investigation fees. On September 24, Deputy Sheriffs Bryant and Flores returned to Ensenada, apparently learning defendant had been taken into

custody; were given copies of the written statement signed by him; interviewed defendant; gave him a *Miranda* warning; and were told he would talk to them, but added he would tell just the part he wanted the officers to know. A conversation ensued which was tape-recorded. At one point in the conversation defendant indicated he did not wish to answer certain questions asked him. In ruling upon the admissibility of the statements given the deputy sheriffs, the court excluded all of the statements made after defendant first indicated his unwillingness to answer.

The Mexican officials in Ensenada referred the matter to the federal district attorney, sending him the original written statement signed by defendant, i.e., the "official declaration," and other official documents. On September 26, the federal district attorney and an assistant to the federal district attorney, interviewed defendant in the federal district attorney's office in Ensenada. Statements made during the interview were recorded by a typist. At this time defendant was being held under Mexican law upon the assumption he was born in Mexico and, for this reason, was a Mexican citizen. The typewritten statement was a repetiton of the facts contained in previous statements constituting a confession of the offense of murder. Each page of the statement was signed by defendant.

Defendant was not prosecuted in Mexico because it was determined he had not been born in Mexico.

On October 1, 1968, defendant was taken into custody by agents of the Federal Bureau of Investigation and delivered to a United States Marshal. His arrest occurred in the United States when he was deported from Mexico by the Mexican authorities. At this time, as heretofore noted, he was wanted on an indictment for inducing the illegal entry of aliens and transporting aliens into the United States; had "jumped bail" posted to obtain his release from detention under that indictment; and also was wanted for the offenses of inducing the entry of illegal aliens, smuggling aliens and transporting aliens into the United States on July 30 and 31, 1968, and for the offense of transporting a stolen automobile from the United States into Mexico, i.e., the murder victim's automobile, occurring on September 3, 1968. Indictments for the immigration offenses occurring July 30 and 31, 1968 and for the transportation of a stolen automobile offense were returned October 23, 1968.

The United States Marshal, following defendant's arrest on October 1, 1968 by agents of the Federal Bureau of Investigation, caused him to be detained in the county jail at San Diego. On the same day defendant was interviewed by agents of the Federal Bureau of Investigation; was given an oral *Miranda* warning; also was given a copy of a written *Miranda* warning which he read and signed; and in response to inquiry by the agents, related

the incidents preceding, attendant upon and following the killing in Tulare. The statements made on this occasion were similar to those theretofore made. The interview was initiated by an inquiry as to how defendant "had been arrested in Mexico, in the State of Baja California, Mexico, in a certain 1967 Buick vehicle." Among other things, defendant said he left the Tulare area; murdered Troyn and took his Buick; drove to Los Angeles; and "traveled on from Los Angeles through San Diego and crossed the International Border from San Ysidro to Tijuana, B.C., Mexico, in the 1967 Buick."

Defendant had been interviewed by an F.B.I. agent on August 2, 1968, prior to his release on bail, and had been given a *Miranda* warning at that time.

The court found specifically none of the statements by defendant were the product of any threat, coercion, promise of immunity or reward or " 'were in any respect involuntary.' " In addition to the facts specifically found, implied in the order admitting in evidence defendant's statements is every fact supported by substantial evidence essential to sustain the order. (*Griffith Co.* v. *San Diego Col. for Women,* 45 Cal.2d 501, 507-508 [289 P.2d 476, 47 A.L.R.2d 1349]; *Estate of Rule,* 25 Cal.2d 1, 10 [152 P.2d 1003, 155 A.L.R. 1319].)

■ The statements made when defendant first was contacted by Officer Carrillo, in the presence of the three officers while being searched for weapons, while being transported to Ensenada in the police truck, and when he was having coffee with the three officers at the police station in Ensenada, were volunteered; were not the product of an interrogation; and were not inadmissible under the *Miranda-Escobedo-Dorado* exclusionary rule. ■ Statements volunteered by a defendant, even though made before he has been given a *Miranda* warning and while in custody, are admissible in evidence. (*Miranda* v. *State of Arizona,* 384 U.S. 436, 478 [16 L.Ed.2d 694, 726, 86 S.Ct. 1602, 1630, 10 A.L.R.3d 974]; *People* v. *Randall,* 1 Cal.3d 948, 955-956, fn. 7 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Ireland,* 70 Cal.2d 522, 536 [75 Cal.Rptr. 188, 450 P.2d 580]; *People* v. *Fioritto,* 68 Cal.2d 714, 718 [68 Cal.Rptr. 817, 441 P.2d 625]; *People* v. *Tremayne,* 20 Cal.App.3d 1006, 1019 [98 Cal.Rptr. 193]; *People* v. *Stewart,* 267 Cal.App.2d 366, 377 [73 Cal.Rptr. 484]; *People* v. *Ashford,* 265 Cal.App.2d 673, 685-686 [71 Cal.Rptr. 619]; *People* v. *Walters,* 252 Cal. App.2d 336, 338 [60 Cal.Rptr. 374].) ■ The statements referred to as an "official declaration" made in the presence of Chief of Police Arceo and Chief of Detectives Mendoza, which were reduced to writing and signed by defendant, and the statements made in the presence of the federal district attorney and his assistant which were reduced to writing and signed

by defendant, were the product of an interrogation in the course of the investigation conducted by the Mexican officials. There is substantial evidence supporting the conclusion these statements were taken pursuant to and in the manner prescribed by Mexican law. At this juncture, we note defendant's contention on appeal the evidence of Mexican law before the trial court does not qualify as substantial evidence authorizing the conclusion defendant's arrest, detention and interrogation by the Mexican officials conformed to Mexican law. We conclude to the contrary. Under the circumstances of this case the admissibility of the statements reduced to writing and signed by defendant without the benefit of a *Miranda* warning depends upon whether the Mexican officials, in taking those statements, were acting in the discharge of their duty as such, or on behalf of the deputy sheriffs from Tulare County. (*People* v. *Helfend,* 1 Cal.App.3d 873, 885-890 [82 Cal.Rptr. 295].) The court concluded, in substance, the Mexican officials were not acting on behalf of the deputy sheriffs in arresting, detaining and interrogating defendant. The evidence supports this conclusion even though it shows the deputy sheriffs asked the Mexican officials to locate defendant and paid them $100 as an investigation fee. There is no evidence the deputy sheriffs asked the Mexican officials to arrest defendant for or to interrogate him about Troyn's murder. On the other hand, as heretofore noted, the Mexican officials were authorized to arrest defendant upon the assumption he was a Mexican citizen and, as such, subject to prosecution in Mexico for the offense of murder committed in the United States; the "official declaration" taken by the Mexican officials was a police procedure authorized by Mexican law; and defendant was detained under Mexican law until it was ascertained his claimed citizenship was unfounded. Under these circumstances, the exclusionary rule adopted to protect an accused in the exercise of his constitutional rights not to be a witness against himself and to have the assistance of counsel is not applicable to the "official declaration" made by defendant to the Mexican authorities. (*People* v. *Helfend, supra,* 1 Cal.App.3d 873, 885, 890.)

The statements made in response to interrogation by the deputy sheriffs and by the agents of the Federal Bureau of Investigation, in each instance, followed a *Miranda* warning. Defendant's claim these statements are inadmissible is premised on the contention they were the product of alleged inadmissible statements made to the Mexican authorities. The conclusions heretofore expressed foreclose this claim.

The court properly held the statements made to the deputy sheriffs after defendant had indicated his refusal to answer further questions were inadmissible.

■ Not raised by either party is the question whether defendant's re-

fusal to answer questions by the deputy sheriffs foreclosed subsequent questioning by agents of the Federal Bureau of Investigation. It is probable the question is not raised on appeal because is was not raised in the trial court, which would foreclose assertion of any claimed error in the premises. (*People* v. *Peters*, 23 Cal.App.3d 522 [101 Cal.Rptr. 403].) However, no error occurred. Defendant had been arrested by the agents for the federal offenses of jumping bail on the charge of smuggling aliens and transporting the stolen Buick automobile from California to Mexico. They interrogated him while he was in custody under this arrest, in the course of their investigation of these offenses. They were not investigating the murder of Troyn. It is not shown they had knowledge defendant previously refused to answer questions asked of him by the deputy sheriffs, following a *Miranda* warning, in the course of the latter's investigation of the murder offense. Defendant's statements to the agents concerning the killing of Troyn evolved as an incident to their investigation of the federal offenses. We conclude, under the circumstances, the statements made to the agents are not excludable. The purpose of the exclusionary rule is to assure respect for an accused's constitutional rights to remain silent and to be represented by counsel. To extend the exclusionary rule to the statements at bench would place a restriction on law enforcement officials not justified by the purpose sought to be attained. In any event, any error in admitting the statements to the agents of the Federal Bureau of Investigation which, in substance, were the same as prior statements made to the Mexican officials, was harmless beyond a reasonable doubt. (*People* v. *Jacobson*, 63 Cal.2d 319, 329, 331 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Cotter*, 63 Cal.2d 386, 397-398 [46 Cal.Rptr. 622, 405 P.2d 862].) This is not a case in which the questioned statements were made after making similar inadmissible statements. (*People* v. *Spencer*, 66 Cal.2d 158, 167 [57 Cal.Rptr. 163, 424 P.2d 715]; *People* v. *Cotter, supra*, 63 Cal.2d 386, 397-398.)

■ Defendant's contention the court erred in denying his motion to dismiss grounded on the claim the delay in prosecution violated his constitutional right to a speedy trial, is premised on the fact the information charging him with murder was not filed until over 17 months after he had been arrested by the agents of the Federal Bureau of Investigation and placed in the custody of a federal marshal. However, the complaint charging defendant with murder was filed November 4, 1968, in the justice court. He was brought before the latter court on February 6, 1970. In the meantime he had been in the custody of the United States Marshal and confined in the county jail at San Diego where proceedings before the federal court on the three indictments heretofore noted were being held.[2] Various delays

---

[2]Pursuant to rule 12, California Rules of Court, we have caused the superior court file to be transmitted to this court.

were encountered in the federal court. Judgment was entered therein on August 29, 1969 convicting defendant of the offenses of smuggling aliens into the United States on July 31, 1968, transporting aliens into the United States on July 31, 1968, transporting Troyn's stolen automobile into Mexico on September 3, 1968, inducing the illegal entry of aliens into the United States and transporting aliens into the United States on October 12, 1966; a diagnostic study followed; and he was sentenced to prison on December 29, 1969. He appealed from the judgment which was affirmed on November 1, 1971. (*United States* v. *Neustice,* 452 F.2d 123.)

The foregoing facts support the conclusion the delay in prosecuting defendant on the murder charge was excusable,[3] and there was no showing he was prejudiced by the failure to prosecute him during the time he was in the custody of the United States Marshal in San Diego. ■ In determining whether delay in the prosecution of a criminal offense is unreasonable within the purview of the constitutional guarantee of a speedy trial, excuse for the delay and the prejudicial effect resulting from such are pertinent factors. (Gen. see *Dickey* v. *Florida,* 398 U.S. 30, 36-38 [26 L.Ed.2d 26, 31-32, 90 S.Ct. 1564, 1568-1569]; *Jones* v. *Superior Court,* 3 Cal.3d 734, 740-741 [91 Cal.Rptr. 578, 478 P.2d 10]; *People* v. *Wright,* 2 Cal. App.3d 732 [82 Cal.Rptr. 859]; see also *United States* v. *Neustice, supra,* 452 F.2d 123, 124.)

■ Defendant also contends his motion to dismiss for want of a speedy trial should have been granted because the district attorney did not advise him of the pending criminal proceedings in Tulare County; for this reason he was unable to make demand for a trial pursuant to Penal Code section 1381.5, requiring a trial within 90 days after such demand; and the delay approximating 18 months required a dismissal under that section. There is no showing defendant was not advised of the pending criminal proceedings. Furthermore, Penal Code section 1381.5 applies to a defendant who has been convicted of a crime and has entered upon a term of imprisonment therefor in a federal correctional institution. Defendant was not imprisoned until December 29, 1969, when his sentence was fixed following completion of a diagnostic study previously ordered. He was brought before the magistrate under the warrant of arrest on the complaint charging him with murder on February 6, 1970. His argument directed to the application of Penal Code section 1381.5 is without merit.

■ During the examination of a witness called by defendant, the following occurred: "Q. Prior to—just prior to Mr. Troyn's death, did a

---

[3]We are not concerned with the delay in prosecution proscribed by statute, i.e., Penal Code section 1382, which is a post-information delay.

woman by the name of Lida Line come to your house? A. Yes, she did. Q. And did you see her? A. No, I was in the house. . . . THE COURT: The testimony that she came by will be stricken. It's hearsay." On appeal defendant objects to the order striking the "testimony that she came by." No objection was made at the trial. Obviously, if the witness did not see Lida Line on the occasion in question, her testimony Lida Line came to her house must have been based on hearsay. Contrary to defendant's contention, the order was not unclear; was limited to the testimony Lida Line came to the witness' house; did not give "the impression that the entire testimony of the witness was to be disregarded"; and properly was made by the court on its own motion. (*People* v. *White*, 43 Cal.2d 740, 747 [278 P.2d 9].)

During cross-examination of a prosecution witness a question was asked in response to which the court said: "That is an embarrassing question to ask." The witness answered the question, which was argumentative. No objection to the comment was made. No error occurred.

■ Defendant also contends he was denied the opportunity to rebut the prosecution's contention his statements to the Mexican officers were volunteered because: (1) The court refused admission of an alleged impeaching statement by Officer Cota respecting the source of a "report" by him, upon the ground it was not impeaching or contradictory. The identity of the "report" in the alleged impeaching statement as one of the two reports the officer referred to in his testimony was not established. No error occurred. (2) The court refused defendant's request for permission to produce additional evidence after all parties had rested and the jury had been instructed. The offered evidence was immaterial and irrelevant. No error occurred. (3) Defendant was denied the opportunity to testify at the hearing respecting the admissibility of the incriminating statements he made to the Mexican authorities, the deputy sheriffs and the agents of the Federal Bureau of Investigation because his counsel did not advise him he could testify at this hearing without waiving his right not to testify at the trial, relying upon the decision in *Simmons* v. *United States,* 390 U.S. 377, 394 [19 L.Ed.2d 1247, 1259, 88 S.Ct. 967, 976]. The record does not show defendant was not advised of his right in the premises. He was represented by able counsel; the claimed denial of an opportunity to testify at the hearing in question is without merit.

■ Defendant moved for a new trial and in the alternative for a reduction in the degree of the offense of which he was found guilty. His motion was denied. He contends, in substance, the evidence as a matter of law dictates the conclusion, under the doctrine of diminished capacity, he

was not guilty of murder in the first degree. This contention is premised upon the claim his diminished mental capacity was established by the opinions of his experts which were not rebutted. Although no other expert witnesses were called, the testimony of defendant's witnesses was subject to infirmities justifying rejection of their opinions. (Gen. see *People* v. *Coogler,* 71 Cal.2d 153, 166 [77 Cal.Rptr. 790, 454 P.2d 686].) No error occurred in denying the motion.

After the jury returned its verdict finding defendant guilty of murder in the first degree he, personally and through his attorney, withdrew his plea of not guilty by reason of insanity. Following this, the court indicated unless there was more evidence than that relied upon to show diminished mental capacity, the showing made would not support a finding of not guilty by reason of insanity. Contrary to defendant's contention, the court's comment did not cast a doubt on whether he clearly and voluntarily withdrew his plea. Defendant, on advice of his counsel, did not communicate with the psychiatrist appointed by the court in connection with the issues raised by his plea of not guilty by reason of insanity, to protect his right against self-incrimination. This advice was premised upon the decisions in *In re Cowans,* 2 Cal.3d 733, 737 [87 Cal.Rptr. 499, 470 P.2d 635] and *In re Spencer,* 63 Cal.2d 400, 408 [46 Cal.Rptr. 753, 406 P.2d 33], holding incriminating statements made to a court-appointed psychiatrist were admissible at the guilt stage of the proceeding. As a result, the court-appointed psychiatrist did not examine defendant for the purpose of testifying and forming an opinion on his sanity at the time of the killing. Defendant argues: (1) His refusal to communicate with the court-appointed psychiatrist to protect his right against self-incrimination at the guilt stage of the trial should not operate as a waiver of his right to assert the defense of not guilty by reason of insanity; and (2) the comment by the court unless there was more evidence of insanity than that produced on the diminished mental capacity issue, the showing would not support a finding of insanity, in effect is a ruling defendant had waived his right to a determination of the issue raised by his plea of not guilty by reason of insanity. The fallacies in this argument are: (1) Defendant withdrew his plea of not guilty by reason of insanity before the court made the comment in question; (2) there is no showing his withdrawal of this plea was premised on the claimed fact the only evidence he might introduce in support of his insanity defense was the evidence of the psychiatrist who testified on the issue of diminished capacity; and (3) he did not request an examination by the court-appointed psychiatrist after the jury's verdict on the guilt phase of the trial and before the insanity phase of the trial. We conclude defendant's withdrawal of his plea of not guilty by reason of insanity was voluntary and was not the

product of any comment by the court or a denial of his right not to incriminate himself on the guilt phase of the trial.

Defendant further contends, in substance, the action of his counsel in consenting to withdrawal of his plea of not guilty by reason of insanity constituted denial of assistance of counsel, which requires a reversal.' The reasons prompting defendant and his counsel to withdraw his plea are not stated. We may not conjecture they were not cogent. There was no showing defendant was denied assistance of counsel.

The judgment is affirmed.

Brown (Gerald), P. J., and Ault, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 18, 1972.