[Crim. No. 10875.   Second Dist., Div. Four.   Dec. 30, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. SAM GILMORE, Defendant and Appellant.

Erling J. Hovden, Public Defender, Forrest Latiner, James L. McCormick, John M. Moore and Kathryn J. McDonald, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged by indictment with a sale of heroin, in violation of section 11501 of the Health and Safety Code, with four prior felony convictions, two of which were for narcotic violations. He admitted the priors but pled not guilty as to the offense charged. After a trial by jury, he was found guilty. A motion for new trial and probation was denied and a sentence of imprisonment in state prison was imposed. He has appealed from the judgment.

It is not contended that the evidence was insufficient to support the verdict, nor that there were any errors at the trial stage which would impel a reversal. The contention made here is that defendant was denied due process of law in that: (1) there was an undue delay between the date of the

offense charged and the date of his arrest, and (2) that he was unconstitutionally deprived of his right to interview and (had he so desired) to subpoena a police informer. In support of these contentions, which were duly and vigorously urged in the trial court, extensive discovery proceedings were held and the transcript of those proceedings is before us as part of the record on appeal.

We summarize the events which are thus presented to us in support of the two constitutional points as follows:

About the middle of January 1964, the narcotics division of the Los Angeles Police Department arranged with a man named Samuel Kinsey to act as an informer for the department. Officer Williams was assigned by his superiors to work with Kinsey as an undercover operative and they proceeded to implement a "buy" program, in which Kinsey introduced Williams to sundry narcotic sellers and arranged for sales to be made to Williams by the persons so introduced. Over 200 purchases of narcotics were made by Williams with Kinsey's aid during a period commencing in February 1964, and ending in May of that year. One of these, allegedly occurring on March 5, 1964, was the one herein charged against this defendant.

In mid-May 1964, it was decided to terminate the program insofar as Officer Williams and the informer Kinsey were concerned, and to seek Grand Jury indictments in the cases theretofore developed by them. A date for presentation of the cases to the Grand Jury was obtained, and Lieutenant Guindon, the officer in over-all charge of the program, directed Officer Cain to advise Kinsey that his services were no longer needed. The interview by which this was accomplished was described by Officer Cain as follows:

"A. Yes. Officer Williams and Kinsey came in the office together. Officer Williams placed him or told him to go to the interview room on the third floor near the Narcotics office and, as I recall then, Officer Williams came to the Squad Room and told me that Kinsey was in the room and at that time I went in and had a conversation with Kinsey. At that time he was told that his services would no longer be needed, that we intended to begin arresting people who Officer Williams and other undercover officers had made purchases from, that we would secure indictments or get complaints through the District Attorney's office. After this I walked back to the Squad Room and I told Officer Williams that he would not be working with Kinsey any more, that if he wished to say

goodbye or so long to him that he might do so at that time and that is when Williams returned to the room.

"Q. And said goodbye to Kinsey? A. Yes.

"Q. Did you have a further conversation with Kinsey after Williams said goodbye? A. I don't believe so. There could have been.

"Q. Did Kinsey then leave the premises of the Police Administration Building? A. Yes, sir."

At the time of trial, except for Officer Cain, no member of the police department had seen, or been in contact with, Kinsey after the farewell scene above described. On May 20 or 21, Officer Cain was advised that Kinsey was in jail on a prostitution charge. Officer Cain visited him, told him to plead guilty if he was actually guilty and left. The officer later learned that Kinsey had pled guilty, was sentenced to five days in jail, served his time and left. No further word of him was had.[1]

I

■ We reject the contention that defendant was denied any constitutional rights by reason of the fact that his case was not presented to the Grand Jury until a little over two months after it occurred. There is no showing that the delay was not for a valid reason nor, except for any possible effect of that delay on Kinsey's disappearance (a matter which we discuss below), that it prejudiced defendant.

[1]Officer Cain was asked, with reference to his activities concerning the misdemeanor prosecution:

"Q. You didn't make any effort to intercede in his [Kinsey's] behalf then, is that right? A. I never talked to any Judges or Court Clerks regarding his sentence, no, sir."

We are asked to take notice of the alleged fact that, in another case, when questioned about this episode, Officer Cain testified that he had talked to the bailiff in the division of the municipal court wherein the misdemeanor case was pending. Officer Cain's testimony as to that conversation was as follows: "And I then said something to Simpson [the bailiff] about I would appreciate it if the opportunity arose and he did get to talk to the Judge and tell him that this person had supplied us with a lot of information, but that I was not interested in getting any charges dismissed or getting any charges reduced or anything along that line."

We deny the request to consider this additional data. Not only do we have grave doubts as to our power to consider matters not before the trial court, but we cannot see that the new testimony would be helpful to us on this appeal. The issue before us is whether or not the trial court, on the record made before it, acted improperly in concluding that the conduct of police and prosecutor, with reference to Kinsey, had not violated the constitutional rights of defendant. We are powerless to speculate as to what effect, on the mind of that court, might have resulted from evidence which, at its utmost, merely casts some doubt on Officer Cain's complete frankness as a witness.

The matter of delay in instituting prosecution in situations such as that before us has recently been discussed in detail by the Court of Appeals for the District of Columbia in *Powell* v. *United States,* decided August 30, 1965. While it is true that, as Mr. Circuit Judge Wright points out in his dissent in that case, where there has been an extensive under-cover buy program, involving many separate purchases, over a long period, from sellers not previously known to the police and seen only fleetingly in connection with a purchase, the officer may make quite honest mistakes when, after charges are filed, he must identify the sellers. But, as the majority in *Powell* point out, these risks must be balanced against the practical problems faced by the police and the net result, as far as mere delay is concerned, must result in favor of the government and not of the defendant. The pros and cons were summarized by that court as follows: ''We think that an accused must show two things in order to invoke an exer-cise of our supervisory power because of alleged basic 'unfair-ness,' cf. *Ross* v. *United States, infra* note 6, resulting from claimed delay in his arrest: that there was no legitimate reason for the delay, and that he was prejudiced by the delay. Appellant bears the burden of establishing his claim, *Nardone* v. *United States* (1939) 308 U.S. 338, 341 [60 S.Ct. 103, 84 L.Ed. 454], *Wilson* v. *United States* (10th Cir. 1955), 218 F.2d 754, 757, *Lotto* v. *United States* (8th Cir. 1946) 157 F.2d 623, 626, and he has not met this burden in this case. The Government says that its undercover agents would be 'blown,' to use the vernacular, if they came to the surface to sign complaints as soon as an offender is detected, and that the Government is entitled to maintain their usefulness by delaying arrests which would reveal them as agents. We believe this position to be both sound and substantial, for the Government, as the representative of the public, has a vested interest in operating at maximum efficiency in its enforce-ment of the law. Public interest in the proper administration of justice permits, if indeed it does not require, the rights and interests of the public to be kept as well protected and free from prejudice as is possible, so long as that protection and freedom is consistent with the rights of an accused. Use of undercover agents is a necessary and accepted police prac-tice, and the interest of the Government in keeping an agent's identity secret for a reasonable period is a legitimate basis for delaying the arrest of an individual wrongdoer

while the agent is continuing his covert investigations. This court indicated in *Nickens, supra,* that the statute of limitations is but one, albeit the ultimate, bar to prosecution. Our view of the instant case is that it presents neither a due process question nor a case for exercise of our supervisory powers.

"Further, since it cannot be seriously argued that the police work wholly independently of the United States Attorney's office in these matters, it would seem that the acknowledged existence of governmental discretion in deciding whether or not to prosecute a given case tends to rebut appellant's claim of right to immediate arrest. We hold that the pre-arrest delay in this case was supported by a commendably legitimate reason. The efficacy of the undercover investigation which revealed appellant as a narcotics trafficker is demonstrated by the fact that 102 arrest warrants were issued for narcotics violations from this one investigation alone. To judicially disapprove of the police practice here involved would virtually end effective enforcement of narcotics laws, for surely it is within the realm of common knowledge and common sense that uniformed or otherwise known policemen are unable to penetrate the *sub rosa* world of the narcotics peddler. Extensive, time-consuming investigations by undercover operatives, who daily risk their lives, are required to get to the retail and wholesale sources of illicit narcotics."

The problem actually is one of credibility of the officer. In the case at bench, Officer Williams was cross-examined extensively on the very point of his identification.[2] The trial court and trial jury believed him, as they were entitled to do.

## II

Although the police conduct herein described approaches the bounds of permissible practice, we conclude that it did not violate the constitutional right of a defendant to ascertain and interview a police informant who participated in the offense charged.

---

[2]The record indicates that Officer Williams was an exceptionally careful officer. It was his practice, as soon as possible after making a "buy," to search the police records for any available pictures, so that his identification at the time of arrest need not depend wholly on his then recollection of identity. In this case, he started his search for a picture on the day of the sale and located a police picture of defendant the following day. The willingness of the trial court and judge to credit the identification is understandable.

The problem thus presented is one of reconciliation of conflicting interests with the hope of preserving the essential rights of a defendant without so limiting police activity as to make effective detection and law enforcement impossible. On the one side, as we recently said in *People* v. *Ayers* (1965) 237 Cal.App.2d 351, 355 [46 Cal.Rptr. 878]: "It is common knowledge that the detection and punishment of much crime—and especially offenses against narcotic laws, and against various forms of vice where there is no 'victim' to complain or to testify—would be impossible unless the police could use the services of an undercover agent." It is equally obvious—as testimony in the record before us recites—that the person can secure the cooperation of addicts and other persons involved in criminal activity only on the condition that they be as anonymous as possible.[3] The reason is plain: disclosure of the fact that the informer has aided the police results, at best, in ostracism and (for an addict) in drying up of his own sources of supply; at the worst it results in physical harm or even death. It follows that court-made rules which infringe on the desired anonymity result, *pro tanto,* in a decreased effectiveness on the part of police and prosecutor.

---

[3]During the discovery proceedings, Lieutenant Guindon described in some detail the procedure used in arranging for the services of an informer:

"He comes to us freely and voluntarily and of his own free will. He is either referred to us by another officer within the division or by some officer who may be in the field that he has information regarding narcotic peddlers within the city of Los Angeles. When this person comes in he is referred to our particular section and in those cases Officer Cain or Sergeant Horstkotte will have a conversation with him. During this conversation with him we elicit from him the names of the narcotics peddlers that he knows. We check this information with information that we have within our office to determine whether or not there is veracity in what he has to say. Then we explain to him our entire operation and the program. We tell him that this is of his own free will. It is voluntarily done, and at any time that he feels that he no longer wants to associate with us, it is strictly a business proposition that he can be free to do so. We will not contact him in any way nor will we go out and hunt him down and there is no force used, no holding of anything over his head in any manner. It is a two-way street. It is a clear business proposition which we are presenting to him and it is up to him as to whether he wants to freely and voluntarily engage in this operation. He is then told how our operation will work which consists of he will take an undercover officer who is a regularly employed police officer around and his primary purpose will be to introduce the officer to these narcotic peddlers so that the officer may purchase narcotics from these peddlers. He will be told, he is also told that this is not a — the officer will not in any manner or in any way become, what would you say, it is based on a friendly relationship because it is not the primary purpose because in these transactions and after

On the other hand, as the Supreme Court pointed out in *People* v. *McShann* (1958) 50 Cal.2d 802 [330 P.2d 33], in *Priestly* v. *Superior Court* (1958) 50 Cal.2d 812 [330 P.2d 39], and in other cases, it is of vital importance to the defendant that he be able to investigate and interrogate the informant and, if needed, to subpoena him for appearance at the trial. Especially in cases such as that before us, where the same officer and the same informant were engaged in a long series of purchases, extending over a substantial period, may the informant prove to be a valuable defense witness. As we have said above, these are circumstances under which the possibility of an honest mistake in identification by the officer is well within the realm of possibility—the officer knows each defendant only as one of a large group of sellers, introduced to him by the informant but otherwise unknown to him, seen perhaps only once and often under conditions of difficult

these people have been arrested we are perfectly honest with him. We have to be honest with him because we feel he is entitled to it as a human being, as an individual, and we have a sense of responsibility for him, that people have been killed, shot, stabbed and beaten from this type of activity.

''He is told that the program will last approximately three to four months and at the end of this particular time which we do not know primarily the specific time, but the program will be concluded, that these people will be arrested and subsequently prosecuted, that we will not require his testimony as far as the prosecution is concerned, but that the defense will probably want him to testify and if and when he is called by the defense he need only tell the truth. He is then told that during the course of investigation that he will be given all expenses that are incurred in this investigation, will be provided by the Police Department.

''He is told also that the only way we do exist is by the obtaining of information from particular people in his category and that we also feel that the community owes him a debt of gratitude because we have no other way of obtaining these people than by people who actually have the information and who are trafficking in narcotics.

''He is told again that at this particular time, this first meeting, that we are not requiring him at that time to give us a yes or no answer, but that he should go home, think about it, realize what he is doing and then if he so finds that he is interested in this type of operation to come back and see us. That is about the substance of the policy, the whole thing which is told to him.''

On the point of anonymity, Officer Cain testified:

''Q. Now, with respect to these informants, do you make any particular effort with them to get all the information about them as to where they live, and so forth? A. No, sir. We have found that we usually get more information, and more information over a period of time, by not inquiring into the background of the people who contact the police department and aid us in information. Q. In other words, the informant, knowing that he has some degree of anonymity, as far as the police, is generally more cooperative and works better with the police department? A. Yes, sir. We found that holds true. Q. Now, with respect to Samuel Kinsey, I take it with respect to him it was pretty much the same with him as it was with other informants? A. Yes, sir.''

observation. It is, therefore, at least possible, for any one defendant, that the informant, if interviewed and called, might testify that the officer was, in this case, mistaken and that the transaction involved was not with this defendant but with some other individual. Due process requires that defendant be given a reasonable opportunity to investigate that possibility.

In *People* v. *Kiihoa* (1960) 53 Cal.2d 748 [3 Cal.Rptr. 1, 349 P.2d 673], rather than disclose the name of an informer, the prosecution dismissed the defendant. Thereafter, when the prosecution learned that the informer had left the state, a new charge was filed and the informer's name was disclosed. The Supreme Court held that these circumstances appeared "to manifest an intention to avoid the very purpose of the disclosure rule," that it showed that "the state sought to circumvent, if not to stultify, the reason for the rule requiring disclosure," and that "The procedure resorted to . . . manifestly denied the defendant a fair trial just as effectively as if the informer had never been identified." (53 Cal.2d at p. 753.)

But in the instant case there is no showing that prosecution was delayed in order that the informer might disappear. As we have pointed out above, the delay was for the quite legitimate purpose of allowing the informer and his policeman associate to complete as extensive a series of purchases as was reasonably possible. And, since the informer was necessarily involved in the continued program, he was still present and available until a few days before the indictments were returned and his identity disclosed.

It is also clear that the prosecution promptly disclosed Kinsey's name, when asked, that defendant was given a full description of him, including every address known to the police and the addresses of his mother and brother. It is not contended that any data, known to the prosecution, was withheld.

At oral argument, counsel for the defendant urged that a necessary implementation of the disclosure rule requires that the police keep the participant informer either in custody or under protective surveillance for a reasonable time after charges based on his assistance are filed and arrests made. No case has gone this far. We think it clear that any such practice would make the use of informers impossible in all but an occasional and atypical case. The balance of interests requires that potential defendants be sub-

jected to the risk of the informer disappearing, so long as the government does not affirmatively induce that disappearance.

In the last analysis, then, defendant's claim that the disclosure rule was violated in this case must rest on a claim that the effect of the final interview between Kinsey and Officers Cain and Williams amounted to such an affirmative encouragement of Kinsey's ultimate disappearance. We do not read any such intent or effect into that episode. As Lieutenant Guindon's description of the informer procedure (quoted in footnote 3 above) makes clear, the informer knew from the beginning: that his services were terminable; that his identity would become known shortly after such termination; and the effects of such disclosure upon him. Under these circumstances, the notification that an informer's services are at an end carries no implication of some covert purpose to frustrate constitutional policy.

Nor can we read any evil intent into the invitation to Officer Williams to say goodbye to Kinsey. The two men had worked together, on an average of four hours a day, for three and one-half months; on these occasions, it was Kinsey who arranged to meet Williams; once the "buy" program was ended, it was unlikely that the two would again meet, whether Kinsey remained in Los Angeles or not. The brief exchange of goodbyes seems to us to have been no more than normal courtesy.

Since we find that the government has not acted for the purpose of frustrating the disclosure rules, it follows that defendant has received a trial meeting the requirements of due process.

The judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 23, 1966.