[Civ. No. 1835. Fifth Dist. Nov. 22, 1972.]

JAMES EDWARD PENNEY et al., Petitioners, v.
THE SUPERIOR COURT OF TULARE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

942

## COUNSEL

Jay W. Powell, Public Defender, and Lloyd L. Hicks for Petitioners.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Nelson P. Kempsky and Arnold O. Overoye, Deputy Attorneys General, for Real Party in Interest.

## OPINION

**FRANSON, J.**\*—On January 26, 1972, the Grand Jury of Tulare County indicted petitioners for the murder of Charles Gibson. On February 18, 1972, petitioners entered pleas of not guilty. On May 8, 1972, they moved to dismiss the indictment on the grounds that they had been denied due process of law by reason of pre-indictment delay. An evidentiary hearing on the motion to dismiss was held in respondent court on May 30, 1972, before N. O. Bradley, judge. On June 21, 1972, the motion was denied. On July 27, 1972, the petition for writ of mandate was filed in this court. On August 22, 1972, respondent was ordered to show cause why such extraordinary relief should not be granted.

---

\*Assigned by the Chairman of the Judicial Council.

■ The threshold question is whether the petition was timely filed in this court. Respondent argues that petitioners made their motion to dismiss the indictment pursuant to Penal Code section 995, and that this court lacks jurisdiction to hear the cause in that the petition was not filed within the 15-day time allowed by Penal Code section 999a. This argument is without merit because the time limitation provided by this section applies only to a petition for a writ of prohibition predicated upon the ground that the indictment was found without reasonable or probable cause. (Pen. Code, § 999a; *McGonagill* v. *Superior Court,* 214 Cal.App.2d 192, 194-195 [29 Cal.Rptr. 485]; *Guerin* v. *Superior Court,* 269 Cal.App.2d 80, 81 [75 Cal.Rptr. 923].) Here petitioners moved to dismiss the indictment not for a lack of probable cause but on the ground that pre-arrest delay had denied them due process of law. Inasmuch as a direct appeal does not lie from the order denying the motion to dismiss (Pen. Code, § 1237; *People* v. *Phipps,* 191 Cal.App.2d 448, 454 [12 Cal.Rptr. 681]), petitioners have no plain, speedy or adequate remedy at law other than by this petition. We conclude that the petition herein was timely filed and within the jurisdiction of this court. (Code Civ. Proc., § 1086; *Jones* v. *Superior Court,* 3 Cal.3d 734, 736-737 [91 Cal.Rptr. 578, 478 P.2d 10].)

From the transcripts of the grand jury proceeding and the evidentiary hearing before the superior court, together with the affidavits and exhibits filed therein, we have ascertained the following:

Sometime between 10:30 p.m. and midnight on January 22, 1966, Mr. Gibson was killed by gunshot during an armed robbery of his liquor store in Earlimart, California. At the time of the robbery Clementina Cantu was present in her mother's house across from the liquor store, and Mr. and Mrs. Joseph Miller were in their "house car," also situated across from the liquor store. These people heard shots, saw two men exit the store, one holding a gun in his hand, and thereafter a car was heard driving off. None of these witnesses was able to identify either petitioner as one of the men seen leaving the store.

On July 25, 1966, Nelson White, an investigator for the Tulare County District Attorney's office, interviewed Betty Ruth Wideman, also known as Betty Moss and Betty Tucker (hereafter Betty) concerning the robbery and murder of Gibson. In the interview Betty implicated petitioners Penney and Moss and one Acey Cannon, since deceased, as the perpetrators of the robbery and murder. Betty repeated her implication of these three persons to the Tulare County Sheriff's investigators in August of 1966. Over a year later, on November 7, 1967, Betty again repeated her story in an interview which was tape recorded by officers of the Tulare County Sheriff's Depart-

ment. In her testimony before the grand jury Betty repeated the substance of these various implicating statements, which can be summarized as follows: At the time of the crime Betty was married to petitioner Moss and living with Moss and his mother in a house at 702 State Street in Earlimart, approximately one-half block from Gibson's Liquor Store. Betty testified that on January 16 or 17 of 1966, she participated in a conversation with Acey Cannon, Johnnie Moss and James Penney, during which the robbery of Gibson was discussed. The plan called for Moss and Penney to rob Gibson and Acey Cannon to drive the getaway car. Penney had a gun which was to be used in the robbery, and after the robbery Moss was to return to his home while Penney and Cannon fled to Delano. Betty was asked to drive the getaway car but declined because she was afraid. Betty watched the robbery from a window at her home which gave her an unobstructed view of the liquor store. She saw Moss and Penney enter the store together, heard gunshots and saw them exit and go around to the side of the store. Moss returned home a few minutes later with $200 cash and was bleeding from a wound in the calf of his right leg. Betty bandaged his leg, and then Moss left with his brother, Howard Moss, for work. Betty said that sometime after the robbery she talked to both Penney and Moss, and they said that they had not intended to kill Gibson but when they started to leave he pulled a gun on them and they had to shoot him; that they took his gun with them when they left the store.

Additional evidence was presented to the grand jury to substantiate Betty's testimony. The Delano Police Department recovered a .38 caliber revolver in a rusted condition. It was turned over to the Tulare County Sheriff's Department on June 19, 1966. The gun, by means of its serial number, was determined to be the gun owned by Gibson. A number of photographs of Moss were taken on August 13, 1966, while he was in the custody of the Merced Police Department on felony charges unrelated to the murder of Gibson. A photograph of the rear of his right leg disclosed scars in the calf area. Merced County Police Sergeant Twiddy, who was present during the taking of these photographs in 1966, testified that in his opinion the scars represented a recent gunshot wound.

Captain Lyman of the Tulare County Sheriff's Department was in charge of the investigation of the robbery and murder. He was present when Betty gave her tape-recorded statement on November 7, 1967, after which he personally presented the case to Assistant District Attorney Evans for prosecution. Lyman testified that he was advised that the district attorney's office would take the case under advisement and notify him "but they never did." He talked with the district attorney's office in the latter part of December 1967 or January 1968 but never contacted them thereafter.

Lyman testified that on January 24, 1968, he received a telephone call from the Bossier City Police Department in Louisiana, indicating that a Donna Potter had given a signed statement to Louisiana F.B.I. agents to the effect that Bobby Isaacs and John Merrell had committed the Gibson robbery. The next day Lieutenant Day of the Tulare County Sheriff's Department spoke via telephone with Louisiana F.B.I. Agent Graves and Donna Potter while Lyman listened. During this conversation Donna stated that Ruby Thompson and she were standing in front of Gibson's Liquor Store and saw John Merrell and Bobby Isaacs commit the robbery and shoot Gibson, after which the four of them went to a motel in Earlimart. Lyman testified that he was of the impression that Donna Potter, at the time of the telephone conversation, was either on drugs or intoxicated because she continually drifted away from the subject of the conversation. Louisiana F.B.I. Agent Graves concurred in this judgment and stated that Donna seemed to be "hopped up" on something. Agent Graves also stated that John Merrell was in jail in Louisiana for beating up Donna and indicated that he would call the Tulare County Sheriff's office if anything further developed. No further call was received.

Lyman testified that about four days after the Gibson murder he and another officer had questioned Donna Potter and Bobby Isaacs, who were then living in Earlimart, in regard to the robbery but nothing relevant was disclosed. Captain Lyman never followed up on the January 25, 1968, conversation with Donna Potter and never sought to interview John Merrell in Louisiana or Bobby Isaacs, even though he learned at the time that Isaacs was in state prison in California. Lyman denied that any charges against Betty were dropped in return for her November 1967 statement; however, he acknowledged that Betty was arrested in the latter part of 1967 as an accomplice to an escape involving a friend and that this charge against her was dropped.

The reasons for the People's refusal to prosecute petitioners prior to the grand jury indictment are set forth in the affidavit of Guy Evans, who was Assistant District Attorney for Tulare County from May 1967 to July 1969, and can be summarized as follows: In the fall of 1967 sheriff's office investigators approached him to obtain a murder complaint against petitioners Moss and Penney. At this time Evans learned that the taped statement of Betty was given in return for a promise by the sheriff's office that an escape charge pending against her and for which she had been arrested would not be filed against her. Shortly thereafter Evans talked to Betty in the county jail, and she confirmed that she had given the implicating statement in return for a promise that charges would not be filed against her. Evans also learned of a statement given by Betty near the time of the murder in

which she exonerated Moss of any complicity in the robbery. When Evans confronted her with the disparity in her statements, Betty replied that she had lied earlier when she had been married to Moss, but she was now telling the truth since she was married to Tucker. Evans indicated to Captain Lyman that he thought there were two major problems with the case. First, it appeared that Betty had been engaged in planning the robbery beforehand and she might be considered to be an accomplice, and if so, her testimony would have to be corroborated by independent evidence. Second, he was worried about the fact that Betty's statement was received in exchange for a promise not to press felony charges against her and for this reason her testimony might not be believed. Evans declined to issue a murder complaint against petitioners until corroborative evidence of an independent nature was found. According to Evans, an unsuccessful investigation was made during the ensuing weeks to find such evidence; that among other things, he examined a full-front profile photograph of Moss clad only in undershorts for evidence of a gunshot wound, but he was unable to find any evidence of such a wound. Early in 1968, Evans "informally received word" that Louisiana authorities had reported that a man facing execution had confessed to the robbery of Gibson; that he made inquiry as to whether the sheriff's office intended to send an investigator to Louisiana to interview the person who purportedly had given the confession, and he was advised that the sheriff's office did not intend to send an investigator to check out the purported confession. Prior to concluding his investigation, Evans also interviewed Clementina Cantu and Mr. and Mrs. Joseph Miller and concluded that they could not identify either Moss or Penney as a perpetrator of the robbery. From the affidavit of Evans and the testimony and written report of Captain Lyman, it appears that the investigation of this crime ceased around January 25, 1968.

With two possible exceptions, the grand jury indicted petitioners on January 26, 1972, on the same evidence as was available to the district attorney four years earlier. The grand jury was shown a picture of the rear of Moss' right leg which, according to the testimony of Officer Twiddy, showed a healing gunshot wound. From the affidavit of Evans, it seems that he did not see this photograph. The pictures of Moss were taken on August 12, 1966, by the Merced Police Department, obviously at the request of the Tulare County Sheriff's Department, and presumably were in the possession of either the Merced Police Department or the Tulare County Sheriff's office in November of 1967 when Evans was asked to review the case for a possible murder complaint. In addition to the evidence of the photograph of the wound on Moss' leg, the People contend that it was not until after Betty divorced Moss that the decision to reopen the case was made, that

until this time the People labored under the belief that Betty's testimony could not be used against Moss because of the husband and wife privilege. (Evid. Code, § § 970, 971, 980.) However, Evans does not indicate that he considered Betty's marriage to Moss as any hindrance to a prosecution of Moss nor is this point mentioned by Captain Lyman.[1]

Betty obtained a divorce from Moss on September 13, 1969. The record does not indicate when the People learned of the divorce nor has any explanation been offered for the delay in prosecuting petitioners for the two years and four months after the divorce.

Petitioners point out that Betty was never in fact legally married to Moss, and therefore the husband and wife privileges were inapplicable to her testimony.[2] However, it does not appear unreasonable for the People to have relied on the appearance of a valid marriage between Betty and Moss; she referred to Moss as her husband, and they were living together as husband and wife at the time of the murder. Whether in 1967 the People should have questioned Betty as to her marital background and checked the public records to verify the legality of her marriage to Moss would depend upon the information available to them at the time and whether in fact the marriage was considered an obstacle to a successful prosecution. These questions cannot be answered from the record before us.

Petitioners contend that because of the delay they cannot receive a fair trial. Petitioner Moss testified by affidavit that at the time the crime was committed he was at his house getting ready to go to work; that his work commenced at 12 o'clock midnight, and it was his custom to ride to work with his brother, Howard Moss. On the night in question, his brother came to his house at approximately 10:30 p.m.; that while his brother was in the house both of them heard loud noises outside which they thought to be either gunfire or automobile backfire. Shortly thereafter Moss states that he and his brother left for work, and they worked the normal night shift on the job; that they later heard that Gibson had been shot and killed. Moss

---

[1]Betty's marriage to Moss would not appear to have prevented a prosecution in 1967 or 1968, for the reason that under Evidence Code section 970 (privilege not to testify against a spouse) only Betty was privileged to refuse to testify against her husband. The record indicates that Betty was willing to testify against Moss as early as November 7, 1967. Under Evidence Code section 980 (privilege for confidential marital communications), if Moss was in fact lawfully married to Betty he could possibly have prevented her testimony concerning the events after his return to their house following the murder; however, he could not have excluded Betty's testimony regarding the planning of the robbery or her eyewitness account of the robbery.

[2]The record indicates that Betty married Robert Tucker on September 1, 1963, and that this marriage was not dissolved until June 11, 1970; hence, Betty "married" Moss on January 19, 1966, while still legally married to Tucker.

states that if his brother Howard were available as a witness, he could testify as to his whereabouts at the time the crime was committed but that his brother died on May 28, 1971, approximately five and one-half years after the crime. Moss further states that he had not hidden his whereabouts at any time since January 22, 1966, and that he has been in the State of California since that time.

Petitioner Penney testified by affidavit that until the time of his arrest he was not aware that he was a suspect; that the police reports of the crime indicate that it was committed between 10 p.m. and 11 p.m. on January 22, 1966; that during those hours he was in Louie's Cafe in Earlimart talking to Louie Rhoades, the bar owner, and John Merryweather, the bartender. He states that he remembers where he was at that time because "someone burst into the bar . . . and said Mr. Gibson had just been shot"; that he cannot now remember, due to the lapse of time, who else was in the bar at the time. Louie Rhoades died November 3, 1971, and John Merryweather also died "three or four years ago . . . I cannot remember exactly when." And he further states that he is not an educated man, having only gone through the 5th grade; that no time since January 1966 has he hidden from the law, that from the date of the offense until 1969 he lived with his mother in Earlimart or at a motel in Earlimart; that in 1969, he moved to Pixley and lived there until the time of his arrest. Everett Stinnett testified by affidavit that he was dealing cards in Louie's Cafe in Earlimart on the night Gibson was shot and that he "believes that petitioner Penney was with him that evening . . . but cannot remember for sure since it was so long ago."

On the question of prejudice to petitioners, it should also be noted that Nelson White, the investigator for the district attorney's office, who first interviewed Betty Wideman on July 25, 1966, died either in August or September 1971. At trial, if White were available as a witness, petitioners would be entitled to try to impeach Betty by examining White at length concerning his conversation with Betty. It also appears that at the present time the whereabouts of Donna Potter, John Merrell and Bobby Isaacs are unknown either to the People or to petitioners, whereas in January of 1968 Potter and Merrell were known to be in custody in Louisiana, and Isaacs was known to be in prison in California.

After considering the evidence, the trial court concluded that the People had conducted a proper investigation of the case in 1967, had determined in good faith that there was inadequate evidence to sustain a prosecution, and therefore there was no denial of due process to petitioners as a consequence of the lengthy delay before indictment. The trial court stated: "On

the strength of the investigation at the time of the incident the decision was made not to prosecute the case. This would not infringe on the defendants' right or impair the defendants' right to a fair trial. *That answers the whole issue.*" (Italics added.)

For the reasons hereafter expressed, we hold that the trial judge erred in failing to consider the prejudice to petitioners occasioned by the delay in prosecution and in failing to balance such prejudice against any justification shown for the delay.

■ In *United States* v. *Marion*, 404 U.S. 307 [30 L.Ed.2d 468, 92 S.Ct. 455], the Supreme Court of the United States, while holding that the Sixth Amendment guarantee of a speedy trial does not extend to those not yet accused of crime, went on to state that the statute of limitations does not fully define an accused's right with respect to events occurring prior to indictment. The court noted a concession by the government that the due process clause may provide a basis for dismissing an indictment if the defense can show that prosecutorial delay in bringing the accusation has substantially prejudiced a right to a fair trial. (*United States* v. *Marion, supra,* 404 U.S. at p. 324 [30 L.Ed.2d at p. 481, 92 S.Ct. at p. 465].) The court stated "[t]o accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case." (*United States* v. *Marion, supra,* 404 U.S. at p. 325 [30 L.Ed.2d at p. 481, 92 S.Ct. at pp. 465-466].)

■■ In *People* v. *Gilmore,* 239 Cal.App.2d 125, 129 [48 Cal.Rptr. 449], the court adopted the due process test for pre-arrest delay enunciated in *Powell* v. *United States*[3] (1965) 352 F.2d 705, 708 [122 App.D.C. 229] as follows: " '[The] accused must show two things in order to invoke an exercise of our supervisory power because of alleged basic "unfairness" . . . resulting from claimed delay in his arrest: that there was no legitimate reason for the delay, and that he was prejudiced by the delay.' "

In *People* v. *Wright,* 2 Cal.App.3d 732 [82 Cal.Rptr. 859], it is stated at page 736: ". . . there is no hard and fast rule establishing how much of a delay in defendant's arrest constitutes a denial of due process to him. Each case must be resolved by balancing the public interest and the rights of the defendant. . . .

---

[3]The *Gilmore-Powell* test has also been applied in a series of decisions in California involving narcotic buy programs and resultant delays in prosecution. (*People* v. *Crowder,* 257 Cal.App.2d 564, 566 [64 Cal.Rptr. 913]; *People* v. *Alvarado,* 258 Cal. App.2d 756 [66 Cal.Rptr. 41]; *People* v. *Wright,* 2 Cal.App.3d 732 [82 Cal.Rptr. 859].)

"This does not mean, however, that the public interest must always prevail. The accused has substantial rights which must be protected, and the delay between the alleged offense and the time of arrest must not result in a deprivation of due process. Delaying the arrest of the accused may hinder his ability to recall or reconstruct his whereabouts at the time the alleged offense occurred."

The California Supreme Court has considered the due process question in the context of pre-arrest delay in two cases. In *People* v. *Archerd,* 3 Cal. 3d 615 [91 Cal.Rptr. 397, 477 P.2d 421], defendant was charged with three counts of murder allegedly caused by injecting his victims with insulin. Noting a pre-indictment delay of more than five years on one murder charge and more than ten years on another, the court held that defendant was not denied a speedy trial or due process. The court stated that the defendant had failed to show a loss of any crucial defense by the delay (the prosecution had located material witnesses or stipulated to their testimony) and, further, that a reasonable investigation had commenced on the first victim's death and continued until a scientific break-through occurred making possible a successful investigation and prosecution which had been previously thwarted.

The court in *Archerd,* at pages 639-640, stated: "Pre-indictment delay has been the subject of some judicial consideration. *Chapman* v. *United States* (2d Cir. 1967) 376 F.2d 705 requires that the defendant show prejudice or improper motive by the prosecution in delaying an indictment. *United States* v. *Deloney* (7th Cir. 1968) 389 F.2d 324 holds that after such a showing the burden shifts to the People to show that the pre-indictment delay was the result of a valid police purpose. *People* v. *Wilson,* 239 Cal.App.2d 358, 365 [48 Cal.Rptr. 638], states 'It is not improbable that under certain circumstances an accused may be deprived of due process of law, if the lapse of time between the alleged commission of the offense and the filing of the accusation makes it difficult or impossible for the accused to prepare his defense.' . . .

"Prejudice . . . may be shown by the loss of a material witness or other missing evidence or fading memory caused by lapse of time."

In *Archerd* the court stated that the facts and circumstances must be viewed in the light of (1) time involved, (2) who caused the delay, (3) the purposeful aspect of the delay, (4) prejudice to the defendant, and (5) waiver by the defendant.

In *Jones* v. *Superior Court, supra,* 3 Cal.3d 734, a complaint was filed and a warrant for defendant's arrest was issued on July 8, 1968, on a charge

of selling heroin on May 7, 1968. Despite knowledge of petitioner's name and address, the police made no attempt to serve the warrant until defendant was arrested 19 months later. In holding that the defendant had been deprived of his right to a speedy trial, the court stated at page 738 of the opinion: " 'The right to a speedy trial is a "fundamental right granted to the accused and . . . the policy of the law since the time of the promulgation of Magna Charta and the Habeas Corpus Act." [Citation.] The function of this vital constitutional provision is to "protect those accused of crime against possible delay, caused either by willful oppression, *or the neglect of the state or its officers.*" ' " (Italics added.)

*Jones* holds that the test for determining whether a criminal defendant has been denied his right to a speedy trial is to weigh the prejudicial effect of the delay against any justification for the delay. The court then stated that the same approach would be applied in deciding a due process claim: "It should be pointed out, however, that a claimed denial of due process would be decided by the same approach, namely, balancing the effect of the delay on the defendant against any justification for the delay. Thus, the impact of this decision cannot be avoided by merely delaying the filing of formal charges so that a particular defendant does not technically become an 'accused' within the meaning of the constitutional guarantee of the right to a speedy trial." (*Jones v. Superior Court, supra,* 3 Cal.3d 734, 741, fn. 1.)

The *Jones* test for determining whether a criminal defendant has been denied due process because of pre-arrest delay has since been applied by the Court of Appeal in *People v. Bethea,* 18 Cal.App.3d 930, 939 [96 Cal. Rptr. 229], involving a robbery where the crime was committed on February 22, 1968, and defendant was not charged until March of 1970. In answer to defendant's contention of a denial of due process, the court, citing *Jones,* held: " 'Delays necessary for reasonable law-enforcement operations will not violate the right to a speedy trial. The conduct of law-enforcement officials would be affected only if they unreasonably delayed initiating prosecution.' . . . 'The prejudicial effect of the delay . . . must be weighed against any justification for the delay.' "[4]

■ It appears that petitioners have made a prima facie showing of prejudice by the delay in prosecution. The prosecution's key witness, Betty,

---

[4]See also *People v. Neustice,* 24 Cal.App.3d 178 [100 Cal.Rpr. 783], where a 17-month delay between time of arrest by federal agents and filing of the information for a state offense was justified by the defendant's being in the custody of the United States Marshal on federal charges during the intervening period. There was no showing of prejudice by failure to prosecute during the interval.

placed petitioner Moss with his brother Howard in their house shortly after the crime; thus, while it is possible that Moss testified falsely in his affidavit as to the time he was with his brother, he has not fabricated the existence of a witness who was with him on the evening of the murder and who conveniently later died. Petitioner Penney contends that two witnesses who could prove that he was in Louie's Cafe at the time of the robbery have since died. There is nothing in the record to show that Penney has or has not fabricated his alibi witnesses. Apart from the death of the claimed alibi witnesses, Nelson White, the investigator for the district attorney's office and the person who interviewed Betty on July 25, 1966, is dead. Also, the whereabouts of Potter, Isaacs and Merrell are now unknown, whereas they could have been interrogated in January 1968 and would have been subject to trial subpoena by either side if desired.

█ A showing of prejudice having been made by petitioners, the burden shifts to the People to establish a legitimate justification for the delay. (*People* v. *Archerd, supra,* 3 Cal.3d 615, 639; *United States* v. *Deloney* (7th Cir. 1968) 389 F.2d 324, 325.) The cases indicate that this requires a reasonable "police purpose" such as time needed to discover additional evidence (*People* v. *Archerd, supra,* 3 Cal.3d 615, 639), delays necessary to complete a narcotic buy program where it is essential that the undercover operator not be identified (*People* v. *Crowder,* 257 Cal.App.2d 564, 566 [64 Cal.Rptr. 913]; *People* v. *Alvarado,* 258 Cal.App.2d 756 [66 Cal.Rptr. 41]; *People* v. *Wright, supra,* 2 Cal.App.3d 732), defendant awaiting trial on other more serious charges (*People* v. *Dontanville,* 10 Cal.App.3d 783 [89 Cal.Rptr. 172]), defendant left state, unable to apprehend (*People* v. *Bethea, supra,* 18 Cal.App.3d 930), defendant charged with state crime in custody of federal authorities (*People* v. *Neustice,* 24 Cal.App.3d 178 [100 Cal.Rptr. 783]). █ The requirement of a legitimate reason for the prosecutorial delay cannot be met simply by showing an absence of deliberate, purposeful or oppressive police conduct. A "legitimate reason" logically requires something more than the absence of governmental bad faith. Negligence on the part of police officers in gathering evidence or in putting the case together for presentation to the district attorney, or incompetency on the part of the district attorney in evaluating a case for possible prosecution can hardly be considered a valid police purpose justifying a lengthy delay which results in the deprivation of a right to a fair trial. By this statement we are not suggesting that a decision not to prosecute, based on a good faith evaluation of the evidence, followed later by a good faith re-evaluation of the same evidence cannot under any circumstances be considered as some justification for a delay. Clearly, a good faith decision not to prosecute on the basis of insufficient evidence should be classified as something more than an absence of bad faith in

determining whether a defendant can receive a fair trial. Whether such minimal justification is sufficient to overcome a showing of prejudice will depend upon the substantiality of the prejudice. Each case must be judged separately on its facts and the particular circumstances surrounding the decision not to prosecute, the length of the delay, and the reasons for the subsequent re-evaluation and prosecution must all be considered.

Once the People have presented the "justification" for the delay, the court is then required to exercise "a delicate judgment" (*United States* v. *Marion, supra,* 404 U.S. 307, 324-325 [30 L.Ed.2d 468, 480-481, 92 S.Ct. 455, 465-466]), by balancing the public interest in favor of the prosecution against the rights of the defendant. (*Jones* v. *Superior Court, supra,* 3 Cal.3d 734; *People* v. *Wright, supra,* 2 Cal.App.3d 732; *People* v. *Gilmore,* 239 Cal.App.2d 125 [48 Cal.Rptr. 449].) In the weighing process, the seriousness of the crime for which the indictment is returned must be given appropriate consideration. The fact that the Legislature has decreed no statute of limitations for murder shows the importance that society places on governmental efforts to bring a murderer to the bar of justice. As recently stated by the United States Supreme Court in *Barker* v. *Wingo,* 407 U.S. 514 at page 522 [33 L.Ed.2d 101 at page 112, 92 S.Ct. 2182 at page 2188]: "The amorphous quality of the right [to speedy trial] also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy."

We believe it is also proper for the court in the balancing process to consider the possibility that the purported testimony of the deceased alibi witnesses has been fabricated. For this reason, all facts relevant to each petitioner's credibility, the relationship of the alibi witnesses to each petitioner and whether petitioners were in fact with the witnesses at the time of the crime, as claimed, should be carefully explored.

Because there is probable cause to believe that petitioners committed the robbery and murder of Charles Gibson, and because the People and the trial court labored under a misapprehension as to the correct test to be applied in considering petitioners' due process claim, we believe that the evidentiary hearing should be reopened for the purpose of allowing the People the opportunity to present further evidence on the question of justification for the delay as well as in rebuttal of petitioners' showing of prejudice, if they are able to do so. We suggest that inquiry should be made

into the question of whether the photograph of the bullet wound in Moss' right leg was shown to the district attorney in 1967 when he evaluated the case, and whether Betty's marriage to Moss affected the district attorney's decision not to prosecute and, if so, in what manner. We also suggest that the People offer proof of the facts leading to the decision to present the case to the 1972 grand jury for indictment.

The matter is remanded to the superior court with instructions to reopen the evidentiary hearing on petitioners' motion to dismiss, to receive such additional evidence as the People can produce relevant to a legitimate justification for the delay, and in rebuttal of the petitioners' showing of prejudice, and to exercise the required judicial discretion by balancing the public interest in prosecuting petitioners against each petitioner's right to a fair trial. The petition for a peremptory writ of mandate is denied without prejudice.

Stone, P. J., and Brown (G. A.), J., concurred.